IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED JAN 23 2015
Clerk, U S District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GILBERT JOSEPH TORRES DONEY, SR.,<br><br>Defendant. | CR 14-50-BLG-SPW<br><br>OPINION and ORDER |

Defendant Gilbert Joseph Torres Doney, Sr. ("Doney") has filed a Motion to Suppress (Doc. 27). This Court held a hearing on January 15, 2015, wherein it heard testimony from Billings Police K-9 Officer Jim Nyquist ("Officer Nyquist"), Billings Police Officer Brandon Ihde ("Officer Ihde"), Department of Homeland Security Agent Jason Pawlowski ("Agent Pawlowski"), Billings Police Detective Jamie Schillinger ("Detective Schillinger"), and Doney. The Court also received several exhibits. For reasons discussed below, the Court denies the motion in its entirety.

## I. Background

Sometime prior to November 20, 2013, the United States Postal Inspector alerted Billings law enforcement about a suspicious package addressed to 1512 Governors Boulevard, Apartment #1, in Billings, Montana (the "Apartment"). The

1

Apartment was rented to Rita Denney. A drug dog indicated to the presence of narcotics in the package. Law enforcement obtained a search warrant for the Apartment and planned a controlled package delivery.

On November 20, 2013, a team of law enforcement waited outside the Apartment while the Postal Service delivered the suspicious package to the Apartment's outside mailbox. Included in the team were Agent Pawlowski, Billings Police Detective Patrick Korb ("Detective Korb"), and Officer Nyquist with Recon, his narcotics-detecting dog. Agent Pawlowski and Detective Korb were not in uniform and wore plainclothes. Forty-five minutes to an hour after the package's delivery, someone from the Apartment walked to the outside mailbox, retrieved the package, and returned to the Apartment.

Within minutes, the law enforcement team attempted to serve the search warrant. The Apartment is located in a building that contains four different apartments. The apartment building has one main front door. Inside the front door are stairways going up and down. Two apartments are located upstairs, and two apartments are located downstairs. The Apartment is found downstairs. The police entered the apartment building, went downstairs, and forcibly opened the Apartment's door after the occupants refused to open it. Four people were inside the apartment, including Denney and Anthony Garcia. The four individuals were detained.

Between 30 to 40 minutes after law enforcement entered the Apartment, Doney arrived in a gray Chevrolet Tahoe. At the time, Agent Pawlowski stood outside the building while Detective Korb searched a vehicle that belonged to one of the people found within the Apartment. Doney exited his car and began walking towards the Apartment. Doney testified that he arrived at the Apartment to give Garcia a previously-arranged ride home. Agent Pawlowski recognized Doney, but he could not remember why or recall Doney's name.

As Doney walked past Detective Korb, Detective Korb said something to the effect of "Don't go in Apartment #1." Doney, not realizing that Detective Korb was a police officer, responded by saying something confrontational and continued walking towards the Apartment. As Doney approached the apartment building's front door, Detective Korb again warned Doney against going into the Apartment. Doney ignored Detective Korb's advice and entered the apartment building.

Doney took one step down the stairway and saw the damage to the Apartment's door that resulted from the forced entry. Doney muttered an expletive under his breath, turned around, and hastily began walking back toward his vehicle. Agent Pawlowski told him to stop, but Doney kept walking away. Detective Korb told Doney to stop and identified himself as police. Doney stopped. Agent Pawlowski asked Doney to identify himself. Before Doney

answered, either Detective Korb or another officer on the scene identified Doney for Agent Pawlowski.

Agent Pawlowski knew that Detective Schillinger had an open narcotics investigation into Doney. On July 31, 2013, Detective Schillinger had a confidential informant contact Doney by telephone to arrange for the purchase of methamphetamine. Doney agreed to sell methamphetamine to the informant and sent a drug courier to meet the informant and consummate the deal. On September 25, 2013, Detective Schillinger again had a confidential informant contact Doney by telephone to set up a drug transaction with Doney. The informant met Doney at a Billings casino parking lot and purchased one ounce of methamphetamine from Doney. Detective Schillinger knew that Doney had prior drug convictions. In addition, sources told Detective Schillinger that Doney was dealing methamphetamine and that Doney drove a gray Tahoe.

Agent Pawlowski put Doney in handcuffs and called Detective Schillinger. Detective Schillinger asked Agent Pawlowski to have Officer Nyquist run Recon around Doney's Tahoe. Detective Schillinger also asked Agent Pawlowski to put Doney's cell phone into airplane mode. When a phone is put into airplane mode, the phone's owner cannot remotely access the phone. In past experiences, Detective Schillinger had suspects remotely access their seized cell phones and

attempt to delete incriminating information from the phones. This is called remote wiping. Putting a cell phone into airplane mode preserves potential evidence.

Officer Nyquist circled the Tahoe twice with Recon. Both times Recon alerted to the presence of narcotics by the driver's door. After Recon alerted on the car, Agent Pawlowski told Doney that the police would impound his Tahoe and apply for a search warrant. Agent Pawlowski released Doney from the handcuffs and told him that he was free to leave. Doney asked if he could retrieve his cell phone from his Tahoe. Agent Pawlowski denied the request.

Agent Pawlowski could clearly see the cell phone on top of the Tahoe's center console. He entered the vehicle so that he could put the phone into airplane mode. Agent Pawlowski grabbed the phone and pushed a button so that the phone's home screen was displayed. He went to "Settings" and pushed a button that engaged airplane mode. Agent Pawlowski then put the phone back on the center console. He did not look anywhere else in the phone, nor did he see any incriminating evidence when he accessed the phone. When Agent Pawlowski entered the Tahoe, he did not search elsewhere in the vehicle.

Doney, Denney, and Garcia drove off together in Denney's car. As they were driving away, Doney thought he saw Agent Pawlowski crouched down and looking underneath his Tahoe's dashboard. Doney saw this for a brief time before Denney's car exited the parking lot.

A tow truck arrived to take Doney's Tahoe to the impound lot. By that time, Officer Ihde had arrived to assist. The tow truck driver asked Officer Ihde to ensure that the Tahoe was in two-wheel drive. Officer Ihde opened the driver's door and confirmed that the vehicle was in two-wheel drive. Officer Ihde then exited the Tahoe. Officer Ihde did not search the Tahoe in any manner or see anything of an incriminating nature. The tow truck driver later briefly entered the Tahoe. He wrapped the seat belt around the steering wheel several times before buckling the seat belt. The tow truck driver did this to prevent the steering wheel from moving around while he was towing the vehicle. The tow truck driver did not report seeing anything of an incriminating nature.

Detective Schillinger obtained a warrant from the Montana Thirteenth Judicial District to search the Tahoe and the cell phone. In the warrant application, Detective Schillinger did not state that Agent Pawlowski saw anything incriminating either in the Tahoe or on the phone. Detective Schillinger also never mentioned Officer Ihde or that anybody saw evidence in the Tahoe while preparing to tow it. The subsequent search of the Tahoe revealed a large amount of cash, methamphetamine, suspected psilocybin mushrooms, a digital scale with apparent residue on it, a second cell phone, and a handgun. None of those items were visible to law enforcement prior to the search.

## II. Reasonable suspicion

Doney first argues that Agent Pawlowski did not have the requisite reasonable suspicion to temporarily detain him. Doney contends that simply appearing at the Apartment after the package's arrival was insufficient to prevent him from driving away. The government counters that numerous factors supported Doney's temporary detention. The Court agrees with the government.

The Fourth Amendment allows police to conduct brief investigative seizures when the officers have "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (internal quotations omitted). "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). The standard is "not a particularly high threshold to reach." *United States v. Valdes-Vegas*, 738 F.3d 1074, 1078 (9th Cir. 2013).

Courts should look at the totality of the circumstances when considering whether officers had reasonable suspicion. *Arvizu*, 534 U.S. at 273. Each fact cannot be considered individually and must be evaluated in the context of the case.

7

*Valdes-Vegas*, 738 F.3d at 1078. A determination of reasonable suspicion "need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277.

The Court finds that plenty of factors support a finding of reasonable suspicion. First, law enforcement reasonably suspected that Doney was involved in the distribution of methamphetamine. Agent Pawlowski knew that Doney was the subject of an ongoing narcotics investigation. Detective Schillinger reasonably suspected the Doney was dealing drugs, as he had conducted two controlled buys of methamphetamine from Doney. The second controlled buy was less than two months prior to the package's delivery to the Apartment.

Second, Doney's appearance at the Apartment was suspicious. Doney arrived relatively soon after the package containing methamphetamine was retrieved by someone from the Apartment. Upon realizing that the police had forcibly entered the Apartment, Doney muttered an expletive and attempted to return to his vehicle. Given that law enforcement already suspected Doney of distributing methamphetamine and that Doney behaved suspiciously, the package's and Doney's arrivals reasonably appeared connected.

Even assuming that Doney appeared at the Apartment simply to give Garcia a ride, Agent Pawlowski still had reasonable suspicion to temporarily detain Doney. A stop can remain lawful even if law enforcement made a reasonable mistake. *Heien v. N. Carolina*, 135 S. Ct. 530, 536 (2014). "To be reasonable is

not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Id.* (quoting *Brinegar v. United States,* 338 U.S. 160, 176 (1949)). While Agent Pawlowski did not know for certainty why Doney appeared at the Apartment, given the totality of the circumstances he reasonably believed Doney's appearance was related to the delivery of methamphetamine.

The government had specific and articulable facts to reasonably suspect that Doney's appearance at the Apartment was related to the arrival of the package of methamphetamine. Agent Pawlowski and Detective Schillinger reasonably believed that Doney distributed methamphetamine. Further, it reasonably appeared to be more than a coincidence that Doney appeared at the Apartment. Doney's behavior upon seeing the Apartment's damaged doorway heightened that suspicion. Since Agent Pawlowski had reasonable suspicion, he permissibly temporarily detained Doney for further investigation.

### III. Canine sniff

Doney next argues that the police did not have reasonable suspicion to have Recon sniff his Tahoe. Doney concedes that after Recon alerted, the police had probable cause to impound the vehicle. (Doc. 28 at 7). As previously discussed, law enforcement had reasonable suspicion to believe that Doney was distributing methamphetamine. But in any event, a canine sniff is not a search, so no

9

reasonable suspicion was required. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). An otherwise lawful stop may violate the Fourth Amendment if there is an unreasonable delay in waiting for the canine to arrive. *Id.* at 407-08; *see also United States v. Villasenor*, 608 F.3d 467, 474 n. 6 (9th Cir. 2010). Here, there was no delay as Officer Nyquist and Recon were already at the scene. The government permissibly used a canine sniff on Doney's Tahoe.

### IV. Alleged premature search of the phone and the Tahoe

Doney argues that Agent Pawlowski impermissibly accessed his phone when he put it in airplane mode. Doney also argues that the police prematurely searched his Tahoe prior to obtaining a search warrant. Doney points to his testimony that Agent Pawlowski was crouched down and apparently looking under the Tahoe's dash while Doney was driving away. Doney also contends that Officer Ihde impermissibly entered the Tahoe when he ensured that it was in two-wheel drive. The government argues that Doney is mistaken and that Agent Pawlowski and Officer Ihde did not impermissibly search the Tahoe. The government also claims that Agent Pawlowski legally accessed Doney's phone to put it in airplane mode. The Court agrees with the government; however, even if the Court believed Doney's version of events, there would be no evidence to suppress.

Police must generally secure a warrant before searching a cell phone's data. *Riley v. California*, 134 S. Ct. 2473, 2485 (2014). In *Riley*, the Court addressed

what steps police could take to prevent the destruction of evidence on a cell phone while seeking a warrant. *Id.* at 2486. To diminish the possibility of the remote wiping of a phone's data, the Court offered two possible solutions. *Id.* at 2487. First, the police could simply turn off the phone or remove the battery. *Id.* Second, the police could use a "Faraday bag" to isolate the phone from radio waves.[1] *Id.* The Court also noted that there may be other targeted ways to prevent the loss of evidence. *Id.* In deciding whether other methods are permissible, such as accessing the phone's settings and activating airplane mode, courts should use established principles regarding the preservation of evidence. *Id.* at 2487-88.

Here, the Court does not need to determine whether putting a phone in airplane mode is an impermissible search, as Agent Pawlowski did not obtain any information from the phone. He did not search the cell phone data, nor did he observe anything of an incriminating nature. In the search warrant application, Detective Schillinger only mentioned that Agent Pawlowski put the phone in airplane mode to preserve potential evidence. Detective Schillinger did not rely on any information gained from the cell phone in the application. Even assuming that Agent Pawlowski violated the Fourth Amendment when he put the phone in airplane mode, no evidence was seized to suppress.

---

[1] At the hearing, Detective Schillinger testified that in his experience Faraday bags are not reliable.

11

Similarly, the Court does not need to determine whether Agent Pawlowski or Officer Ihde illegally entered the Tahoe. Neither Agent Pawlowski nor Officer Ihde observed any incriminating evidence when they briefly entered the Tahoe. Detective Schillinger did not rely on any known evidence located within the Tahoe in the search warrant application. Assuming the Agent Pawlowski and Officer Ihde impermissibly entered the Tahoe, there is nothing to suppress.

## V. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that Doney's Motion to Suppress (Doc. 27) is DENIED.

DATED this 22 day of January 2015.

SUSAN P. WATTERS
United States District Judge